Case 15-5762, Halane Miller v. Abbott Laboratories Oral argument not to exceed 15 minutes for the plaintiff and 15 minutes for the defendant, Ms. Young, for the appellant. Good morning, your honors. May I please the court? I am Marguerite Young, and this is my co-counsel, Amos Jones, and as noted, we're the counsel for the appellant, Halane Miller, and we have asked to reserve five minutes of our time for rebuttal, and we decided not to split our argument. We present three errors from the district court below that involve both an error of fact and an error of the application of the law to the facts as they apply to two of the three prongs of a retaliation claim. As to prong one, as to whether the employee had a reasonable expectation that she was engaging in protected activity, the lower court concluded that she did not because she reported a known joke, and that is not the record below. At the time she reported the incident of a bribe offer made by a co-worker to the head of a home health agency, 98% of whose patients were Medicare patients. At the time she reported that and had two extensive discussions with her immediate superior, there was no mention that it may have been a joke. And then later when she spoke to the head of the home health agency who became upset that she was going to get embroiled into a controversy and might even have her agency investigate her, the head, whose name was Karen Krilstepny, said it was probably just trash talking. Forget about the joke thing. She also knew that it wouldn't be accepted, right? Yes, and that was the second error we felt, that the court said she could not believe that the bribe could lead to a false claim because Ms. Miller knew the head of the agency. They had previously worked at Abbott and had been trained in compliance matters, and she knew she was ethical and would not accept a bribe. However, we contend that the focus of the report was to stop a rogue employee at Abbott from going around and offering bribes to heads of health care agencies. And there's nothing that I know of in the law that says the ethics of the bribee vitiate the conduct of the briber. So the focus of the report and the purpose of the report was to stop a possible violation, and had Ms. Krilstepny, the head of that agency, agreed to accept the bribe, that would have led to false claims. And the whole point of the extensions of the protections under the 2009 and 2010 amendments was to stop the horses before they get out of the barn, so to speak. She never said that's why she did it. Well, what she said to her boss, the minute she told her boss what happened, she said, Tom Berry offered a bribe, offered quid pro quo, offered to split a $100 bonus with the head of the agency if she would do a protocol, get cracking on a protocol for Abbott. And a protocol was a method by which they recommended that patients purchase Abbott products. It's very similar to a prescription, except you don't have to have a paper when you go pick it up at the drugstore. So she said that, and the minute she told her boss that, her boss gasped, oh, explicities committed, which is like an excited utterance that acknowledges we could be in deep trouble here. And then as she discussed it with her boss, because her boss wanted to investigate it herself, she, her exact words were, I have seen serious infractions, but this one is over-the-top quid pro quo. I'm sorry, your client said this. Correct. Ms. Miller told her boss, this infraction is serious, it's over-the-top quid pro quo. And when Abbott first wrote up the report about the incident by the Office of Ed's Equal Compliance, they wrote down we have a situation of possible quid pro quo activity. And as we asserted in our brief, the term quid pro quo is often synonymous with bribes. And so therefore, the point is stopping bribing, bribery, bribery as conduct by an employee, not to focus on the fact that, you know, the target of the bribe just so happens to be ethical. And a reasonable employee would be thinking, if he did this to one person, and it was just a coincidence that we found out about it, how many other people is he making this offer to? And the point of the law is to judge the protected activity from the circumstances known at the moment it's reported. And we also claim that the court erred as to Prompt 2 because it ignored or overlooked the strong evidence in the record that Abbott had foreknowledge that bribes violate the anti-kickback statute. In fact, their foreknowledge was so extensive that they wrote up two pages about it in the Code of Business Conduct. What does that have to do with anything? I'm sorry, what? I don't understand. What does that have to do with anything? If you acknowledge ahead of time that a bribe violates a certain statute and everyone knows that, then when the employee comes in to report the bribe and is alarmed, this is serious, we've got a bribe, do we require that employee to recite, redundantly, the statute that we've all admitted we know about in order to be considered engaging in protected activity? And that's what the court said. The court said Abbott did not have notice that she was engaging in protected activity rather she was reporting general wrongdoing. But in the context of Abbott and a company like Abbott or Novartis, we cited two of the Novartis cases where these companies, they've been sanctioned heavily for bribes to doctors and health care providers. They've paid out $1.5 billion. They're experts in the anti-kickback statute and the False Claims Act. And they have just recently, six months before the incident occurred, Abbott entered into an agreement, a plea agreement, a settlement, and a corporate integrity agreement with the federal government in which it promised that it had already voluntarily begun monitoring bribes. And they promised that any employee who reported a bribe would have confidentiality and would be protected from a retaliation. So they've made all these promises that induce the employee to report a bribe. And then when she does, they say, ha, ha, ha, it doesn't count because you didn't say the magic words and you didn't recite the statute. And the Novartis court in Malaki v. Novartis held that you can look at a company's internal documents to ascertain whether they were on notice, whether they had signed them, or whether they knew that bribes violated a statute. And so, therefore, they knew conduct was willful and knowing. And it's our contention that in a context where a company like Novartis or Abbott already knows that bribes are wrong, it's manifestly unfair to require an employee to recite a statute before she gets protection. It's a little bit pejorative to refer to something that is outspoken in the award if we win something together as a bribe. I mean, I guess you could technically do that, but it wasn't called that, was it? Well, it was called an inappropriate quid pro quo. Which you now call a bribe. Yes, because our case law... They don't know, they don't call it that. Well, but they knew, and the deposition testimony said that Abbott pranged all the employees that you cannot pay or offer to pay a customer. I understand that there's a legal argument for it, certainly. Thank you. Thank you. May it please the Court. David Morrison and Kerry Nelson on behalf of Abbott Laboratories. Ms. Miller raises certain policy issues, but this case, on this record, is not the vehicle to resolve them. Ms. Miller is literally making a federal case out of losing her job 11 months after she reported that a coworker may have suggested to a customer that he would split $100 fines with her. Of course, in between her October 2012 report and her September 2013 employment termination, she admittedly failed two different certification tests, one three different times. In fact, Ms. Miller doesn't dispute in her deposition that her performance in 2013 justified a 60-day performance plan in June 2013. And in August 2013... There's no factual disputes as to whether that's all sort of a set-up, long-term response to the terrible thing that she did. Your Honor, there is no factual dispute that she went to Employee Relations in June 2013 and admitted that she had done three errors, that she was totally unprepared, and she admitted she was unprepared to take the tests in February 2013. So there's no factual dispute there. There is no factual dispute that she thought the counseling plan was appropriate. This isn't the basis that the district court relied on? It's not. We're just setting up a standard, Your Honor, that when she was... Was the district court correct in its analysis? The district court was correct in its analysis, Your Honor. Do address that. I will. Here, the plaintiff is looking to somehow anchor a wrongful termination claim on the October 2012 report and contorts it into protected conduct under the False Claims Act as the cause of the termination decision. She did report something that was improper. She appropriately reported something that was improper. It was not inappropriate for her to make the report. She was lauded as having engaged in ethical conduct for making the report, and Abbott took it seriously and investigated it. But when she made that report, she's trying to turn the report into an illegal inducement under the Anti-Kickback Statute, and that's not what she's doing. Well, okay. She… Somebody offered somebody something in exchange for adopting a protocol. And afterwards, the person said it was a joke. Forget about that. I mean, that's, you know, protecting themselves. So somebody offered money in exchange for adopting a protocol, and that could be regarded as a kickback, and it also could lead to a false claim because if the protocol is adopted, then that could lead to a false claim. So she reported this because it was improper. She reported that it wasn't an offer to provide money in exchange for a protocol. It was—the record is that Ms. Miller actually had talked with Ms. Curl Stepney before Mr. Berry ever had about adopting a protocol. Ms. Curl Stepney was already planning on adopting a protocol, and a protocol is not, as suggested by counsel, a method to purchase added products. It's a system by which healthcare—home healthcare advocates can go and identify whether or not there's malnutrition of a patient and then identify ways to address that malnutrition. A protocol is adopted, and Ms. Curl Stepney testified that she was adopting it, or the affidavit is, that she was adopting it because it was in the best interest of her business and of the patients, and Ms. Miller testified to that as well. The Abbott Labs purpose for the protocol is to sell their products, right? It's a sales job. Abbott Labs is encouraging its sales associates to go into nursing facilities or home health agencies and encourage them to adopt those protocols so that the protocol might ultimately end up recommending an added product, and the patient could decide whether or not they wanted to take the added product.  It's encouraging them to prescribe the medicine for which they have a product that they would sell as that medicine. I don't think the protocol actually does that. The protocol is simply actually identifying whether or not— it's a very kind of consultative type of sales approach. I'm saying by analogy so we can understand the nature of it. By analogy— By analogy, the salesperson wants the doctor to adopt this protocol and give it to patients so the patients will follow it, and when they follow it, they're likely to buy Abbott Labs products although they could buy someone else's products. Is that right? That's right. So it's basically a sales-motivated, from the Abbott Labs perspective, getting the protocol adopted as a sales tool. It is a sales tool. It's not a contract. It's not a binding contract, but it is a sales tool. I mean, it is some— They're going to sell more Abbott Labs products if more health agencies that use these things use that protocol than some other protocol. They might. That's their goal. That they would hope. But that protocol is certainly going in there to assist the patients. Which kind of protocol is going to win the contest? One that emphasizes a lot of Abbott Labs products or one that—or what? Yes, the protocol. You could either just put a template together, which is just a kind of a formula or something that was more— I'm asking about the criteria. There wasn't criteria. It was— Just the best one? The best one, and it was something that was unique, something that was going to be more likely to be adopted. It wasn't one that repeated Abbott's name 10 times. No, I understand. It was something that was going to be effective for a home health caretaker to understand that if I see malnutrition, there is a way to assist the patient with certain products. That we produce. Could be, but that— I don't—I mean, I think it might be better for you to concentrate more on the—what's required under the statute. Because, I mean, are you saying that if there was an Abbott sales rep who went around leaving $100 bills with these people in the— such as this woman here, and said, you know, here's $100, I hope you'll adopt this protocol, and he went around doing that, I don't think you're saying that that wouldn't potentially violate both the anti-kickback statute and the false claims if these were Medicare patients. We are not— Certainly, that is not the record, and obviously that's not a hypothetical that would apply to the situation. In fact, counsel argues that what she was trying to— I'm going to answer the question. What if it were? It's a hypothetical question she's posing. Would that be a violation or not? If an Abbott labs sales representative gave $100 bills to different people and asked them— In exchange for adopting protocols. For every protocol that one of his customers adopted, he gave them a $100 bill. I would say that if for every patient that was referred to Abbott he gave a $100 bill, that could be an anti-kickback statute violation and a false claims act violation. If your answer is no, that would not be a violation. Excuse me? If your answer is no, that would not be a violation. He could do that. I don't think that it would be a false claims act claim. If you acknowledge that there is— A false claims act claim requires there to be a submission to the government of a claim. But let's say that these are all Medicare patients or Medicaid patients and the person that he's leaving the $100 with has a protocol that involves these patients consuming these Abbott supplements and making claims for reimbursement. What your honor is asking is similar to what Jones McNamara's— the court, this court, ruled. And we cited, too, in our 28-J letter— Unpublished opinion. Well, actually I don't know that it's unpublished. It came out, it was— It's unpublished. Go ahead. So this court in Jones McNamara took up the question about whether or not an anti-kickback statute alone could cause or constitute a violation of a false claims act. And there the question— And similar to what you're addressing here is the question of whether or not there could be— If there was a widespread marketing plan, could that give possible reasonable belief of a false claims act? That could create a false claims act potentially. That's not the situation we have here. We have a report of a single incident. There was no record evidence that she had any contemplation that he had said this to anybody else. There's no record evidence that he said it to anybody else. And under Jones McNamara, it would be unreasonable to assume that he did this to anybody else. And that's the standard of this court. That's what he's doing. Why is it unreasonable to assume that somebody who offered one buyer 50 bucks didn't offer them all 50 bucks? Because there's no evidence that he did that. There's no evidence that if— There's only one prize that would be awarded, and if he won it. So he needs to win it, and then if he wins it, he would need to then give her $50. And that's assuming that he was serious when he made the comment. And I know you're saying set aside the joking comment, but Kroll-Stepney's testimony is that it was a joking comment. Ms. Miller's testimony is that when she talked to Kroll-Stepney the same day, Kroll-Stepney says, that's not—that's joking. When Kroll-Stepney speaks to Miller's boss, she said he said it in jest. When Miller was interviewed by the investigator, she said it may have been a joking comment. So why is it reasonable to assume that when someone says, hey, if I win the contest, I'll give you $50, that that is an anti-kickback statute or that that was reasonably intended to induce the referral of added products? And that's what Jones-McNamara asks for this court to examine, whether or not it was reasonable to assume that even if he was serious, that $50 could induce anyone to refer patients or to adopt protocols. And what Jones-McNamara says is that it's not. And in that case, Jones-McNamara actually reported that there were illegal kickbacks. She believed that there were anti-kickback statute violations. She informed her employer that she believed that money may need to be reimbursed to the government. But the Sixth Circuit held that that did not rise to the level of protected conduct under the False Claims Act. Despite the plaintiff's disclosures, it wasn't reasonable to believe that the underlying conduct could or did lead to fraud in the government. And if Jones-McNamara didn't engage in protected conduct under the False Claims Act for purposes of an SCA retaliation claim, Ms. Miller did not. In Jones-McNamara, there was a $23.50 coat, another $25 lab coat, and picnics a couple times a year. But that wasn't enough to reasonably induce... The standard under Jones-McNamara, which is reiterating what McKenzie said, is that you need to have a good faith belief and you have to have a reasonable belief that the employer is committing fraud against the government to engage in protected activity under the SCA. In Jones-McNamara, she tries to establish that, and she actually alleges that someone received the kickback, and that alone wasn't protected activity. The AKS violation must result in a submission to the government for reimbursement, and that referral, the $50 inducement, has to have been reasonably capable  So here, Ms. Miller's argument is that the $50 alone could be enough. But under Jones-McNamara, it's not reasonable to assume that an offer to pay $50 could be... How does that... How does that weaken from both the purpose of the statute? So before somebody reports that a colleague is trying to buy Medicare business, Medicaid business, you have to... You've got to really think, well, is this likely? Is $50 enough? Is $100 enough? You know, are they likely to agree to it? I mean, should somebody who's reporting what they think could lead to a false claim against the government have to go through that kind of analysis? Well, the question is whether or not she's engaging in protected conduct under the False Claims Act. And she needs to connect her report to fraud in the government. And what Jones-McNamara turns to is the Office of Inspector General Guidance on what it means to induce. And there, the court said it would be ludicrous to believe that a person would be tempted to make illegal referrals in exchange for nominal gifts. So all you're doing is saying, don't report, because unless you're going to be able to really show that it would have worked, you're not protected. Well, I would say that in this instance, when she reports something in October 2012, and then 11 months later, it's terminated. Different question. She reported conduct under Abbott's Code of Conduct. She reported it. Abbott took it seriously. Abbott investigated it. She was lauded for engaging in ethical behavior. That doesn't convert her conduct into protected conduct under the False Claims Act. We don't want to have every comment that's made turned into an anti-kickback statute violation that's also then turned into a fraud on the government. That then creates a protected status for everybody who makes a comment to their employer. That would not be the right policy either. Here, Ms. Miller knew when she reported the comment that it could not and did not induce an illegal referral. So she did not have either a good-faith belief or a reasonable belief that Mr. Berry's comments could or did induce Ms. Pearl Stepney to prefer Abbott over another competitor. In addition and in conclusion, her subjective belief that a retaliatory motive was the real reason for her termination and not a poor performance is not enough to meet her burden of persuasion. We ask this Court to affirm the judgment of the law. Thank you. I appreciate that the Jones-McNamara v. Holzner case was referred to because that case is totally ineptitude. That case follows the former case of U-Haas and this Court and the law has held that when one is hired to be a compliance monitor, one has a higher standard to meet in order to engage in protected activity. The plaintiff in Jones-McNamara was a vice president of compliance, of ethical compliance. Why is that different? Because those individuals are held to a higher standard because it's their job. The minute they walk into... If everything they do is protected activity, the employer... Why is holding them to a higher standard? I don't see how that makes a difference. Well, that's what the courts have held in both Jones' and in the U-Haas case. They have distinguished when an employee is hired to be a compliance monitor and they say that's your regular job to ferret out and investigate... So they should know better what is likely to result in a violation than someone else. Is that the idea? Well, it's their responsibility to investigate it and get to the bottom of it. All other employees are just supposed to report. And the other thing, I think, that distinguishes Jones-McNamara is that the bribe offer was... It was hammered as in hot dogs. The company, ambulance company, gave free hammers and hot dogs at a health fair. And they gave one doctor a jacket and something else. But none of that was directed to the head of the agency who was in a position to recommend the services. Whereas in our case, the bribe offer was made to the head of a home health agency who had the power to recommend advent products. And I have wrestled with why would a compliance officer have a higher standard than a regular employee. But I think it's because they were hired specifically to report compliance. That is the regular course of business. Maybe even the hot dogs were compliance officers. No, and Jones-McNamara, the plaintiff, was the vice president of corporate compliance. And she complained that the ambulance company gave free hot dogs and hamburgers at a health fair to low-level hospital employees. And the court said, it was the circuit said, those low-level employees were not in a position to recommend the ambulance services. And also, the... And therefore, her report was not protected. Correct, because she had a duty to investigate it. She was the investigating officer. And she didn't... She reported it in private claim protected activity before fulfilling her duties to fully investigate. And so, in that circumstance, she had no belief that these small bribes would lead to violations of the False Claims Act. Because she couldn't stop it. Yes. I read Jones-McNamara with the Juhasz case where the plaintiff was not given protection because he was a compliance monitor and it was his regular job to report up the line any violation. I suppose the... Oh, I can't remember what the fellow's name was. Her co-worker went to... This... Was it Street Beat or something like that? What? I can't remember what lady's name was the lady's name. Herboth? No, no, no. Miller? Ms. Miller went to a customer. Oh, Karen Curl Stepney. Yeah, Stepney, yeah. And said, and Stepney said, hey, your buddy said he'd give me, split this bonus with me. Yes. He was joking. But she didn't say he was joking until later. She didn't say it then. She didn't say it then. But... She goes back and she... Miller really doesn't think that that was a bribe, did she? It was an attempted bribe. If I'll pay you money... Did she really think it was a bribe? So she goes and tells her boss. She said her words to her boss, this is serious, over the top, quid pro quo. Sure, sure. And her boss says, oh, poopy, and this is not good. Correct. But then they go and investigate and they find that this is probably a joke. Well... But more importantly, Miller knew that this supposed bribee, I won't mess her name up again, let's just call her the bribee, wouldn't have taken that anyway. Correct. So did she have a reasonable belief that a bribe that was going to lead to a false claim had occurred? She was... Not had occurred, but could likely occur or lead to a bribe. Well, how could it if she knew that the lady would not take it? Because the concern it raises is the conduct is so egregious that she worries that, in fact, she told her friend, the bribee, you know, it's bad conduct like this that comes back to bite Abbott in the butt. That's what she said. Because you automatically think, oh, this is so outrageous for them to do. Who else is he doing it to? And that's why it has to be stopped. The policy of the false claims reporting is to stop the self-policing, to stop it before it becomes full-blown and becomes a cancer that, you know, destroys you. And I think the fact that Abbott investigated it and took it seriously says they knew she was engaging in protected conduct. And under these circumstances, it should not be necessary for an employee to have to recite the law. Otherwise, only employees who have lawyers can be protected. On that theory, would it be a protected activity to report that someone said he was thinking about splitting his... Well, we haven't yet... We've got to nip it in the bud, so maybe we've got to nip it in the tiny bud. Well, if we had a way to monitor thoughts, perhaps. But once he said it... But it sounds like your theory would suggest that that would be protected as well. No, speech is conduct. Thoughts are not. But he spoke about his thoughts. Well, he expressed an intent to offer her a payment if she would do something that recommended his products. So if he said, I'm thinking of giving her a five-spot if she prepares a protocol that wins the contest, and that's reported, and then the person a year later is fired, that would be protected activity? Under your theory, I would say yes, don't you? Well, we've shown a clear pattern of continuous retaliation. What's the answer? Well, there's no safe harbor in the anti-kickback statute. So the answer is, it is protected or it's not protected? The reporting of a payment to induce a recommendation of purchasing your products. You don't want to answer the question? Well, I think it is. The law doesn't give an amount. I'm not talking about the amount. I'm talking about, I'm thinking about doing this. I'm going to talk to my priest before, but I'm thinking about doing it. She reports that. She says, I heard him say, I'm thinking about doing it. I'm going to talk to my spouse first before I do it, but I'm thinking about doing it. She reports that. That stops it right in the mud. But he declares that he is entertaining an intent to do wrong. And under the statute, we want employees to report so that that person could be prosecuted. So the answer is yes? Yes. Thank you. Thank you, Your Honor. Thank you. The case will be submitted. I believe the other case is on the briefs. It is. So you may, there's two more. You may adjourn the hearing. Thank you. This honorable court is now adjourned.